## TERRITORY *v.* WILLIAM TITCOMB.

## No. 2340.

SUBMITTED MARCH 18, 1938.    DECIDED APRIL 16, 1938.

COKE, C. J., BANKS AND PETERS, JJ.

OPINION OF THE COURT BY COKE, C. J.

The plaintiff in error, defendant in the court below, William Titcomb, was found guilty by a jury in the circuit court of the first judicial circuit of assault and battery upon one Louis Kekona, a man of feeble mind and who at the time of the assault was the ward of the accused. From his conviction and sentence Titcomb has sued out a writ

of error. Two errors, both similar in character, are assigned by appellant. They may be summarized as presenting for review here a single question, namely, did the trial court err in permitting the complaining witness Louis Kekona to testify against the accused because "he was a feeble-minded person, *non compos mentis,* and without sufficient or any knowledge of the nature and obligation of an oath and lacking in other mental qualities essential for a competent witness to possess"? At the time Kekona was called to the witness stand by the prosecution, counsel for appellant challenged his competency for the above reasons. At the request of appellant, and with the consent of the witness, he was examined by Dr. Faus, a psychiatrist, and by Dr. Porteus, a psychologist. After a rather full hearing directed to tests of the mental capacity of the witness by the court as well as by counsel for both appellant and prosecution, the court permitted Kekona to testify. This action on the part of the court forms the basis of the present appeal. Kekona was at the time of the trial twenty-six years of age. The two experts found him to be not insane but feeble-minded and mentally subnormal. Dr. Faus gave him the mental rating of a child of six or seven years of age. Dr. Porteus stated that he had the mentality of a child of seven years. Dr. Porteus further stated that he would want corroboration of Kekona's story before accepting it. And while the witness indicated a hazy conception of the Supreme Being and slight knowledge of local geography, as well as people of current prominence and the rudiments of simplest arithmetic as well as of other matters of common knowledge, his examination by the judge at the trial resulted in a showing sufficient, we think, to qualify him as a witness. When a witness is offered, the presumption that he is competent may be challenged and while it must be conceded that the courtroom is not an ideal psychological laboratory, it then becomes the legal duty of the court to inquire into

his fitness. In most jurisdictions the subject is controlled by statute modifying the common law but often varying therefrom less in essence than in language. Hawaii has no statute prescribing intellectual qualifications of adult persons offered as witnesses. Section 3823, R. L. 1935, under the caption "Who May Testify," does not refer to the subject and section 3825, R. L. 1935, is confined to the qualifications of minors. In the case at bar the witness was an adult. We are therefore relegated to the common law as ascertained by English and American decisions. In England, under the harsh and inflexible rule of the earlier common-law doctrine, every insane person was deemed to be *non còmpos mentis* and therefore incompetent to testify and many of the earlier American cases adopted the same rule. In 1851 in *Reg.* v. *Hill,* 5 Cox C. C. 259, Lord Campbell announced a drastic departure from the ancient rule. In that case a patient in a lunatic asylum was offered as a witness for the crown to testify on the trial of the defendant charged with homicide. After the witness had been examined as to his competency and had clearly indicated that he was laboring under hallucinations he was permitted to be sworn and gave a rational account of what he had witnessed. Discussing his competency, Lord Campbell said: "Various authorities have been referred to, which lay down the law, that a person *non compos mentis* is not an admissible witness. But in what sense is the expression *non compos mentis* employed? If a person be so to such an extent as not to understand the nature of an oath, he is not admissible. But a person subject to a considerable amount of insane delusion, may yet be under the sanction of an oath, and capable of giving very material evidence upon the subject-matter under consideration. The just investigation of the truth requires such a course as has been pointed out to be pursued. * * * It has been contended, that the evidence of every monomaniac must be rejected. But that rule would

be found at times very inconvenient for the innocent as well as for the guilty. The proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath? The lunatic may be examined himself, that his state of mind may be discovered, and witnesses may be adduced to show in what state of sanity or insanity he actually is; still, if he can stand the test proposed, the jury must determine all the rest. In a lunatic asylum, the patients are often the only witnesses to outrages upon themselves and others, and there would be impunity for offences committed in such places, if the only persons who can give information were not to be heard." The prevailing doctrine is in accord with this decision, and the principle is generally recognized that a lunatic or a person affected with insanity is competent to be a witness if he has sufficient mind to understand the nature and obligation of an oath, and correctly to receive and impart his impressions of the matters which he has seen or heard. (26 A. L. R. 1488.)

Subsequently the Supreme Court of the United States in *District of Columbia* v. *Armes,* 107 U. S. 519, similarly as the English court in *Reg.* v. *Hill, supra,* declared: "The general rule, therefore, is, that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the court, upon examination of the party himself, and any competent witnesses who can speak to the nature and extent of his insanity." *In re Paul,* 18 F. (2d) 448, the court said: "Arbitrary rules fixing the competency of a witness 'mentally incompetent' to testify do not obtain. Courts have been 'keeping pace with the progress of science' and enlightened unfolding, and have

relaxed the rigor of the rules, and now competency depends upon the understanding and moral sense—the degree of intelligence and understanding—of the witness." (See also *People* v. *Enright,* 99 N. E. 936.)

So it may be said that the modern rule is, briefly, the witness will be deemed competent if he has the ability to observe, recollect and communicate the essentials about which he is called to testify with accuracy sufficient to make the narration correspond to the knowledge and the recollection. In addition he must appreciate the nature and obligation of an oath. (See *State* v. *Leonard,* 244 N. W. 88; 1 Wigmore, Evidence [2d ed.], § 478.) Such requirements may immediately preclude the proposed testimony in cases of extreme mental incapacity for the idiot and the hopelessly insane witnesses will be unable to fulfill any of them. Insanity which does not impair the faculties to such an extreme degree will not bar the witness; nor will the normal infant of tender years *nor the adult of retarded mind* be deemed incompetent. (*Tucker* v. *Shaw,* 41 N. E. 914; *State* v. *Crouch,* 107 N. W. 173; *State* v. *Simes,* 85 Pac. 914.)

The finding by the trial court of the mental competency of Kekona after a careful examination should not be disturbed unless clearly erroneous. "The decision of this question rests primarily with the trial judge, who sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence as well as his understanding of the obligations of an oath. As many of these matters cannot be photographed into the record the decision of the trial judge will not be disturbed on review unless from that which is preserved it is clear that it was erroneous. These rules have been settled by many decisions, and there seems to be no dissent among

the recent authorities." *Wheeler* v. *United States,* 159 U. S. 523, 524.

The jury had a right to, and undoubtedly did, consider Kekona's mental impairment as having bearing upon the weight and credibility of his evidence. In fact the witness, after taking the oath, gave a surprisingly lucid and clear account of the attack upon him by the appellant. This is not a case where conviction was had upon the mere testimony of the prosecuting witness. His testimony was merely cumulative for, aside from his statements, there was an abundance of evidence to establish the guilt of the accused. The unmistakable evidence of severe physical injuries to the prosecuting witness and the confessions of the accused shortly following the assault alone were amply sufficient to establish guilt. Dr. Ikeda, a neighbor, testified that the appellant came to his office the day after the alleged assault and, referring to the injuries to the complaining witness, said: "Well, I beat him with a hose and I sent him to bed without his supper." And on the same day the accused stated to Police Sergeant Sam: "Last night after the show I came home and I couldn't find Louis Kekona at home so I felt restless,—couldn't sleep the whole night" "thought the boy had bled to death or had drowned some place. * * * I admit I beat the boy up. I beat him up severely. I beat him up because I lost my head." A similar confession was made by the accused to Officer Paul Keliikoa.

The evidence adduced at the trial put it beyond peradventure that the accused perpetrated a wanton, vicious and brutal assault upon his unfortunate, feeble-minded ward, inflicting without mercy, grievous physical injuries.

Finding no error in the record, the judgment of the lower court is affirmed.

*E. J. Botts* for plaintiff in error.

*J. C. Kelley,* Public Prosecutor, and *C. E. Cassidy,* Assistant Public Prosecutor, for the Territory.